(63 South. 288.)

No. 19,894.

HIBERNIA BANK & TRUST CO. v. C. F. KNOLL PLANTING & MFG. CO., Limited (MURPHY, Intervener).

(June 30, 1913. Rehearing Denied Oct. 20, 1913.)

*(Syllabus by the Court.)*

1. MECHANICS' LIENS (§ 73*)—STATUTES (§ 239*)—PRIVILEGE—ESSENTIALS.

If the law provides (as it does) that no agreement for work exceeding $500 which has not been reduced to writing and registered shall enjoy the privilege accorded to the undertaker, and if it further provides that no agreement shall enjoy that privilege unless the exact amount called for by it be fixed and stated in terms, then no agreement which does not conform to both of those requirements can enjoy the privilege, for privileges are the creations of the law, and the law creating them is to be strictly construed as granting to particular persons advantages which are not enjoyed by the people generally of common right.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 87, 88, 90–102; Dec. Dig. § 73;* Statutes, Cent. Dig. § 320; Dec. Dig. § 239.*]

2. MECHANICS' LIENS (§ 73*) — PRIVILEGE — FIXED AMOUNT—NECESSITY.

In legal contemplation that is regarded as certain which may be made certain, and a fair implication from the law creating and regulating the privilege of the undertaker, in connection with contracts for work exceeding $500, is that, when the contract is reduced to writ-

ing and recorded, it enjoys the privilege, though the amount be not fixed and stated in precise terms, provided, under the terms of the contract, the amount called for is susceptible of being made certain. It will not do, however, for the contractor, in any event, to say, of a contract calling for more than $500, whether on its face or in its execution, that he did not know how much it would call for, and hence did not reduce it to writing or record it, for such a contract, unwritten and unrecorded, enjoys no privilege.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 87, 88, 90–102; Dec. Dig. § 73.*]

3. FIXTURES (§ 9*)—VENDOR'S LIEN—PROPERTY SUBJECT—IMMOVABLES.

Bagasse and syrup conveyers in their places and a piece or section used for the repair of a defective smokestack become parts of the sugar house, to which immovable the privilege of the vendor of the articles mentioned does not extend. The privilege is therefore lost.

[Ed. Note.—For other cases, see Fixtures, Dec. Dig. § 9.*]

Appeal from Thirteenth Judicial District Court, Parish of Rapides; W. F. Blackman, Judge.

Action by the Hibernia Bank & Trust Company, trustee, against the C. F. Knoll Planting & Manufacturing Company, Limited, with John H. Murphy intervener and third opponent. From the judgment, the intervener appeals. Reversed in part, and affirmed in part.

Hall, Monroe & Lemann, of New Orleans, and White, Thornton & Holloman, of Alexandria, for appellant. C. F. Borah and H. G. Bloch, both of New Orleans, for appellee.

Statement of the Case.

MONROE, J. Plaintiff obtained executory process directing the sheriff to seize and sell certain plantation property, belonging to defendant, in satisfaction of a mortgage debt amounting, with interest, to $133,750, and John H. Murphy, doing business under the name of John H. Murphy Iron Works, intervened in the proceeding, alleging that during the year 1910, at the verbal request of the owner, defendant herein, he furnished labor

and material, which were used in the construction of the sugar house on said property, to the value of $2,708.86, for which he had recorded a sworn, itemized statement, claiming a first lien and privilege therefor, further alleging that about September 25, 1910, he sold to defendant a bagasse and syrup conveyer (meaning probably a bagasse conveyer and syrup trough) for $160.79 and 15 feet of smokestack for $148.40, which articles were on the seized premises susceptible of identification, and on which he claimed the vendor's privilege for the unpaid price. He prayed that the sugar house be appraised separately; that the conveyer and smokestack be appraised and sold separately; and that he have judgment, with recognition of the liens and privileges claimed. The court appointed two appraisers and ordered them to appraise the sugar house separately so as to show its value in proportion to that of the entire property and to appraise the conveyer and smokestack separately, and also ordered that the two articles last mentioned be sold separately and that the sheriff make a separate return concerning them and hold the proceeds of the entire sale subject to further order.

Plaintiff, for answer to the intervention, denied that intervener had any lien or privilege on the sugar house and alleged that, if he ever had such right, he lost it by failing to record it within the proper time or, if not in that way, by failing to have both the sugar house and the plantation separately appraised; and it also denied that he had any vendor's privilege on the conveyer or smokestack, alleging that those articles had lost their identity and had become parts of the sugar house; and further that the order to sell them separately was void. The defendant made no answer.

The facts of the case, as we find them, are as follows:

Some time, probably during the first half of 1910, defendant purchased the entire sugar-making outfit then on Poydras plantation, below New Orleans, with a view of removing it to, and installing it in, a sugar house to be erected on its property in the parish of Rapides, and it was of course anticipated that a change of that kind would involve the expenditure of considerable work and material. Mr. Knoll, representing defendant, therefore had a conversation with Mr. Naquin, who was in charge of intervener's foundry and machine shops at Alexandria (in Rapides parish) upon that subject. It appears that he at that time (say in the month of July) had definite information only to the effect that three out of four smokestacks, included in his purchase, were no longer serviceable, and that he was under the impression that the fourth could still be used, though, as it turned out, it required a new section 15 feet long. He knew that other work and material would be required for new parts and repairs but did not know of what it would consist. Beyond that he had a fancy for having the smokestacks of the same height; and, as the boilers were to be erected at different elevations, he was unable to say just then what would be the exact lengths of the stacks. The result of his conversation was that Mr. Naquin submitted to him a written proposition, agreed upon in advance, in duplicate, as follows:

"I propose to furnish f. o. b. Alexandria, La., * * * as specified below: This proposal is made for immediate acceptance. * * * One smokestack 68½" in diameter by 70' long, one-third to be made of $3/16$, one-third of No. 8, and one-third of No. 10, steel, with four angle iron $2\frac{1}{2}"x2\frac{1}{2}"x5/16"$ to run the entire length of stack. Stack to have bands at top and bottom $\frac{1}{2}x2\frac{1}{2}"$ and eight 1" eye bolts with reinforcing plates on the inside. Price 4 cents per pound.

"One smokestack 48" in diameter by 70' long [with details similar to but not identical with those above given]. Price 4 cents per pound. * * *

"We will further agree to furnish four men, viz., two boiler makers and two helpers, for the sum of $16 per day, 9 hours to constitute one day's work; you are to furnish transportation,

board, and lodging for men; extra men will be furnished at 60 cents per hour for boiler makers, and 35 cents per hour for helpers. Terms 30 days net cash."

Mr. Naquin was asked while on the stand:

"Did Mr. Knoll ever advise you that he had accepted your proposition?"

To which he replied:

"Yes, through Mr. Marsh [Knoll's engineer]; in fact, he accepted it then, when we agreed to it, and asked me to make it out in writing and return it to him."

He also testified that he afterwards requested that one of the duplicates signed by Knoll be returned to him, but that Knoll was busy and was reported to have mislaid or lost the papers, and that he (Naquin) did not know until the trial that they had been signed. However that may be, it is upon the basis of his written proposition and its acceptance that intervener for the most part makes the charges contained in the account sued on though with a view of showing that the agreement thus entered into and acted on was not sufficiently specific, as to the amount involved, to have made it available for recording purposes. Mr. Naquin was asked a number of questions and answered substantially as follows:

"Q. Then state whether or not it was possible to estimate in advance the exact sum that those smokestacks would come to? A. Not exactly; I could figure it out approximately, if the heights were given at that time. It is almost impossible, because iron varies. Sometimes the thickness of the sheet is not the same, especially in thin iron."

Mr. Naquin also gives the following testimony as to his understanding with Knoll concerning work not specified in the written instrument but which was actually done, to wit:

"It was understood at the time that there would be considerable other work, and this work would be given to us, as they came to it, to put up the refinery from time to time. * *
"Q. State some of the different kinds of work these men did on the sugar house? A. First, I think they were working on oil tanks; after

that they were engaged on boilers, in riveting the drums, and so on, and also connected the smokestacks. Some patches ordered to go on the heater; the men put them on. Then there was a new mud drum ordered; we made that in the shop, shipped it down there, and they put it on. Some smoke boxes made and breechings made. Q. What kind of a mill was this Mr. Knoll was building? A. Sugar mill. Q. New or secondhand? A. Secondhand. Q. Then what was the nature of the work principally of these men there? A. Principally repair work and some new work attached to the old work. Q. Was this repair work too on boilers, etc., brought there from elsewhere? A. Connecting the boilers and assimilating all the different parts around there in our lines. * * * Q. Referring to that account, state whether or not it represents one continuous, general building and repair job on that sugar house. A. I considered it to be a continuous account for the simple reason that, when we agreed on the first part of the work, it was understood that we were to furnish what material would be needed to do this work and also furnish the men to do the work that was necessary to be done at the refinery."

The account sued on is sworn to and itemized and is shown to have been delivered to the recorder of mortgages on November 25th and recorded on November 26th, and a question which is considered important is: What was the last day upon which work was done under the "continuous" engagement, as referred to in the foregoing question and answer? The evidence leaves no doubt that the regular grinding began on November 9th, though the mill had been given a "try-out" just prior to that date; and we think it pretty clearly established that the "hoods and umbrellas" were put on the smokestacks after the grinding began, though it is a little strange that Marsh, who was the engineer, or one of the engineers, there at the time, and who was called as a witness for intervener, was unable to remember it. Naquin testifies that the work of putting them on was completed on November 19th, and Dove testifies that he was engaged in helping Williams in that work on the 16th, 17th, 18th, and 19th. Knoll, while he admits that the putting on of the hoods and umbrellas was always understood to be a necessary part of the con-

struction of the sugar house and seems to admit that it was done after they began grinding, testifies that the agreement with regard to it was made after all the work done under the previous agreement or agreements had been completed and intervener's workmen had gone home and taken their tools; and it is shown that none of Naquin's men were on the plantation on November 9th, when grinding began, and his account contains a charge $3.75 of date November 11th for freight paid on tools returned. On the other hand, the order for the hoods and umbrellas appears on the account as of date November 12th, but it is an irregular entry, appearing before the entry of November 11th, and creating the impression that it was made at some later date and from memory. The evidence as to the exact dates upon which the work of putting on the hoods and umbrellas was begun and completed is, upon the whole, unsatisfactory. The sugar house was appraised for $120,000, but it was not appraised in such a way as to show its value in proportion to the value of the entire property, because there was no appraisement of the entire property; and, in order to meet that difficulty, intervener called the appraisers to the stand, during the trial, as witnesses and (over objection) elicited their testimony to the effect that the plantation was worth $60 an acre, or a total of $68,400. The conveyer and section of smokestack were appraised and sold separately and were adjudicated to intervener, who was allowed to retain the amount bid by him pendente lite. The district court gave judgment for intervener and against defendant for the total amount claimed, rejected intervener's demand to be recognized as having the privilege of a furnisher of labor and material on the sugar house, but recognized the vendor's lien claimed by him on the conveyer and section of smokestack, though it denied his right to remove those articles. Intervener alone has appealed, but

plaintiff has answered, praying that the judgment appealed from be amended, in so far as it recognizes the vendor's lien, as above stated.

## Opinion.

[1] Though the amount to become due, under the written agreement for the smokestacks, was not fixed, it was readily susceptible of being fixed, since all that was required was to multiply the number of pounds of iron that were put into the stacks by the price agreed on; and Naquin knew that the total amount to become due would be more than $500; the fact being that he furnished 24,793 pounds of iron, the price of which, at 4 cents a pound, was $1,191.72.

The stipulation in regard to the boiler makers and helpers is, upon its face, of more doubtful meaning and is not altogether clarified by the oral testimony. Naquin, as we have seen, testifies that:

"It was understood that we [they] were to do this work [referring apparently to all the work charged for on the account] and that we [they] were to furnish what material would be needed to do this work, and also the men to do the work that was necessary to be done at the refinery."

There was, however, no agreement as to what work was or would be necessary at the refinery; in fact, it was not then known, and could not be known until after the arrival, from Poydras plantation, of the outfit upon which the work was to be done, and even then, in the nature of things, it was to be largely within the discretion of Knoll. Moreover, Knoll, though admitting that putting the "hoods" and "umbrellas" on the smokestacks was a necessary part of the construction of the "refinery," testifies that at the time that Naquin's men left the place, prior to November 9th, he did not know whom he would employ to put them on. Nevertheless, as he does not deny the statement of Naquin that there was a verbal agreement, contemporaneous with the writ-

ten agreement fixing the price of labor, to the effect that such work in intervener's line as might be required to put the refinery in order would be given to him, as that work *was* given to him, and as the stipulation fixing the price of labor would have been meaningless if it had not been so intended, we are of opinion that the written and verbal agreements are to be taken together, as part of one contract, the amount involved in which was ascertainable, as to the smokestacks (as we have stated), by multiplying the number of pounds of iron furnished by the agreed price per pound, and for the rest by multiplying the number of days' labor furnished by the agreed price per day. And, knowing as they did, that, upon the basis agreed on, the price of the smokestacks alone, exclusive of the cost of setting them up and of making and fitting on the hoods and umbrellas, would far exceed $500, the parties also knew that the amount thus contracted for would be increased by the price of the other work contemplated by the contract in proportion to the days' labor required at the agreed price per day. Whether, then, the contract be regarded as part written and part verbal, or wholly verbal, as intervener contends, the Civil Code expresses itself very clearly upon the subject of any privilege that might be claimed thereunder as follows, to wit:

"Art. 2775. No agreement or undertaking for work exceeding $500, which has not been reduced to writing, and registered with the recorder of mortgages, shall enjoy the privilege above granted."

The article thus quoted is found under the title "Of lease," the subtitle "Of the letting out of labor or industry" (as contradistinguished from the "Letting or hiring of things"), and in section 3 of that subtitle, which deals particularly with the rights of persons who let out their services in connection with the construction of buildings and other works or who furnish the material as well as the labor. The pertinent provisions, preceding article 2775, are:

"Art. 2772. The undertaker has a privilege, for the payment of his labor, on the building or other work, which he may have constructed. Workmen employed immediately by the owner, in the construction or repair of any building, have the same privilege."

The article then proceeds, at considerable length, to make provision for workmen and other persons (not "employed immediately by the owner" but doing work upon buildings under employment by a contractor or undertaker), whereby, upon pursuing a certain prescribed course, they may become subrogated to the privilege of the contractor and may, under certain circumstances, acquire a right of recovery against the owner. The seventh paragraph of the section provides that:

"All the foregoing provisions shall apply to the person furnishing materials of any kind to be used in the performance of any work or construction of any building, as well as the work done and performed towards such building," etc.

The privilege granted by the article applies, therefore, not only to the claim of the undertaker for the price of his labor but also to his claim for the price of the material furnished by him.

Articles 2773 and 2774 deal with the rights of workmen and persons furnishing material to the undertaker and declare that they have no action against the owner who has paid the undertaker (unless the payment has been made "in anticipation") but may cause moneys due him to be seized and are of right subrogated to "his privilege"; that payments made to him in anticipation do not deprive them of those rights. And then comes the article 2775 which has been quoted. Under the title "Of privileges" and the subtitle "Of privileges on immovables," the lawmaker declares (in article 3249) what privileges shall affect immovable property, and among them is the privilege conferred by article 2772 on the undertaker for the price of his labor

and material, but there is nothing in article 3249 that in any manner affects the requirements of article 2775. A little farther along we find a subtitle, "How privileges are preserved and recorded," under which is provided as follows (omitting so much as is irrelevant to the present inquiry):

"Art. 3272. * * * Undertakers, * * * those who have supplied * * * material, * * * preserve their privileges, only in so far as they have recorded, with the recorder of mortgages in the parish where the property is situated, the act *containing the bargains they have made, or a detailed statement of the amount due,* attested under the oath of the party doing or having the work done, *or acknowledgment of what is due them by the debtor.*

"Art. 3273. Privileges are valid against third persons, from the date of the recording of the act or evidence of indebtedness as provided by law.

"Art. 3274 [as amended and re-enacted by Act 45 of 1877]. No privilege shall have effect against third persons, unless recorded in the manner required by law in the parish where the property to be affected is situated. It shall confer no preference on the creditor who holds it, over creditors who have acquired a mortgage, unless the *act or other evidence of the debt* is recorded within seven days from the date of the *act or obligation of indebtedness,* when the registry is required to be made in the parish where the act was passed or the indebtedness originated, and within fifteen days, if the registry is required to be made in any other parish of this state. It shall, however, have effect against all parties from the date of registry." (Italics by the court.)

The intervener, whose contract, from his point of view, was entirely verbal and was never recorded, relies upon the articles thus quoted, as dispensing him from complying with the requirements of article 2775.

It is said that his contract did not call for a fixed amount; that it was a continuing contract under which orders for work and material were given from time to time; that it was impossible for him to know in advance what amount would become due him; that the law contemplates that the "act," or whatever it may be, which is to preserve the privilege, shall express a fixed amount, but never requires an impossibility, and hence did not require him to record a claim for a fixed amount until it was possible for him to fix it,

and allowed him seven days from that time within which to record the claim.

If the law provides (as it does) that no agreement for work exceeding $500 which has not been reduced to writing and registered shall enjoy the privilege, and that no such agreement shall enjoy the privilege unless the exact amount called for by it be fixed and stated, in terms, then no agreement which does not conform to both those requirements can enjoy the privilege, for privileges are the creatures of the law, and the law creating them is to be strictly construed as granting to particular persons advantages which are not enjoyed by the people generally of common right.

[2] In legal contemplation, however, that is regarded as certain which may be made certain, and a fair implication, from the law creating and regulating the privilege of the undertaker, in connection with contracts for work exceeding $500, is that, when the contract is reduced to writing and recorded, it enjoys the privilege, though the amount be not fixed and stated in precise terms, provided, under the terms of the contract, the amount called for is susceptible of being made certain; as, for instance, in a case such as this, where manufactured articles, to be made of iron or steel, are to be delivered at a fixed price per pound and labor is to be furnished at a fixed price per day and hour. It is common information that a builder in many instances and an architect generally makes a contract whereby he is to receive, as his compensation, a fixed percentage upon the cost of the labor and material to be expended in the work, and that the one thing more certain than any other concerning building plans and specifications is that they will be changed and the expense increased before the completion of the work; and it seems to us that it was probably in view of those conditions that the law, granting the privilege in favor of the undertaker and providing for its

preservation, contains no requirement for the specification in the contract of a fixed amount. The nearest approach to such requirement is found in C. C. 2756, which has no bearing upon privileges and merely declares that:

"To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price."

It would hardly be contended, however, that a builder could not "build by a plot" or "work by the job" upon a commission or percentage basis instead of for a fixed sum.

Article 2775 contains nothing about a fixed amount save the declaration that no agreement for work exceeding $500 shall enjoy a privilege unless reduced to writing and recorded. Article 3249 contains nothing on the subject. Article 3272 provides that architects, undertakers, etc., preserve their privileges only in so far as they have recorded "in the parish where the property is situated; *the act containing the bargains they have 'made*" (with certain other provisions to which we will revert a little later). And article 3274 (as amended and re-enacted) provides that no privilege shall affect third persons unless recorded as required by law, and that:

"It shall confer no preference on the creditor who holds it, over creditors who have acquired a mortgage, unless *the act or other evidence of the debt* is recorded within seven days [or fifteen days, in certain cases] from the date of *the act or obligation of indebtedness*."

So far, therefore, we find no requirement of a fixed amount, but everything to indicate that the thing to be done, where the agreement calls for more than $500, is to reduce it to writing and record "the act containing the bargain," or (as expressed in article 3274) "*the act or other evidence of the debt*." Reverting to the provisions of article 3272, to the effect that an undertaker's privilege may be preserved by recording "*a detailed statement of the amount*

*due*, attested under the oath of the party * * * or *acknowledgment of what is due to them by the debtor*," it is plain that, if any building contract, no matter for what amount, may enjoy the undertaker's privilege, provided that, after the completion of the work, the undertaker records an attested account or records the acknowledgment of the owner, article 2775 is abrogated, and (so far as the law which has been discussed in this case is concerned) no building contract need be reduced to writing or recorded. But the canons of construction do not permit the utter sacrifice of one provision of law to another, where they may reasonably be construed as operating in different fields or where, for any other reason, legitimate effect can be given to both. Article 2775 deals, in terms and exclusively, with the contracts of undertakers for work and material exceeding $500. Article 3272 purports to provide the methods by which privileges on immovable property, including those of undertakers and workmen, whether for work exceeding $500 or less, may be preserved, and the provisions made are appropriate to the different cases. Where the contract exceeds $500, the act (meaning the written instrument required by article 2775) "containing the bargain" (whatever the bargain may be) is to be recorded. Where the contract is for less, or where the party interested is a laborer or cartman, employed perhaps, by the day, and who is therefore not within the contemplation of article 2775, it is sufficient that he record a detailed and attested statement or the acknowledgment of the debtor of the *amount due*, which, of course, can be done only when the amount has become due, and the same thing may be said of the expressions "or other evidence of debt," and "or obligation of indebtedness," found in article 3274. That article declares that, in order to give to a privilege *of any kind* a preference over a previously inscribed mort-

gage, the *"act or other evidence of the debt"* (upon which the privilege is founded) must be recorded, within (say) seven days from *"the date of the act of obligation of indebtedness."* The word "act," as thus used, is applicable to the written instrument required by article 2775, and the words "or other evidence of debt" may be applied to cases where no written contract is required and the party interested files an attested account or files the acknowledgment of the debtor; and so the words "obligation of indebtedness" may be applied to cases other than those contemplated by article 2775 and are used in the broad sense of the Civil Code, which calls him a debtor who contracts an obligation to do or not to do, as well as him who contracts an obligation to pay money. C. C. 1900, 1910, 1933, 1934; Morgans, etc., Co. v. Stewart, 119 La. 392, 44 South. 138.

There has been a good deal of legislation, intended for the benefit of persons employed by contractors and undertakers, and which materially affects the rights and obligations of the other parties to building contracts, in their relations to such persons, but we have not referred to it because it seems to have no particular application in this case.

See Acts 134 of 1880; 180 of 1894; 123 of 1896; 134 of 1906; 65 of 1908; 167 of 1912.

It will, no doubt, be conceded that, though the undertaker may not know, in advance, the exact amount that his contract will call for, he may know whether it will exceed $500, as the intervener now before the court knew it, and, so far as we have been able to discover, there has been no legislation which has relieved him, when he asserts a privilege under such contract, of the obligation of showing that the contract was reduced to writing and recorded as provided by the different articles of the Code to which we have referred, which obligation has rest-

ed on him for nearly a century and has been, time and again, enforced by this court.

The act of February 18, 1817 (Acts 1816–17, p. 118), contained a provision similar to that contained in article 2775 of our present Code, and the Act of 1813, c. 29, declared that all liens having the effect of legal mortgages should be recorded within ten days. In Jenkins v. Nelson's Syndics, 11 Mart. (O. S.) 437 (1822), it was held that a contract exceeding $500, which had not been reduced to writing and recorded within ten days, enjoyed no privilege.

In Oddie v. His Creditors, 6 Mart. (N. S.) 473, the court said that it was doubtful whether there was any written contract, but, "such as it appears, it was not recorded, and hence that it conferred no privilege."

In Taylor et al. v. Crain's Administrator, 16 La. 290 (1840), the court, referring to C. C. 2746 (now 2775), said: It provides expressly "that no agreement or undertaking for work exceeding $500, which has not been reduced to writing, and registered with the recorder of mortgages, shall enjoy the privilege above granted"; i. e., the privilege of undertakers, etc. It is clear, then, that under this provision, when the work exceeds $500, two requisites are indispensably necessary for the very creation of the privilege itself, even between the employer and the undertaker. The agreement must be reduced to writing, and it must be registered in the office of the recorder of mortgages. If the act is recorded within six days from its date, when it has been passed in the place where the registry of mortgages is kept, or adding one day more for every two leagues from the place where the act was passed to that where the register's office is kept, the privilege is valid against third persons, even from the date of the act, and confers a preference over creditors who have recorded mortgages before the date of its registry; but, if not recorded within the above specified time, the privilege

degenerates into an ordinary mortgage and will be good against third persons only from the time of its being recorded. Louisiana Code, 3240, 3241 (now 3273, 3274).

In Spence v. Brooks, 6 La. Ann. 63, it was said of a claim of "$556.55 for labor and material for the construction of a house":

"It appears that there was no agreement reduced to writing and registered, * * * and, under these circumstances, * * * there should not have been a decree of privilege."

In Whitla v. Taylor, 6 La. Ann. 480, it was said:

"It will be observed that the language of article 2746 [now 2775] is peculiar, and no privilege exists, in contracts over $500, even as between the contract and the proprietor, without recording. For the enjoyment of the privilege, the contract must be 'reduced to writing and registered with the recorder of mortgages.'"

In McRae v. His Creditors, 16 La. Ann. 306, it was said:

"Henry Tenny claims $952 for timber furnished and labor done on the sugar house of R. W. McRae. But he has no privilege for this work, which exceeded $500, inasmuch as his contract was not reduced to writing nor registered. C. C. 2476 [now 2775], 3239 [now 3272]."

In Murray v. Sweeny, 48 La. Ann. 763, 19 South. 754, the court, approving the decisions in Taylor v. Crain, Spence v. Brooks, and McRae v. His Creditors, supra, said:

"With reference to the privilege claimed by the plaintiff as entitled to preference, it is radically null against third persons, for no agreement was reduced to writing and registered, as required by the article of the Code. The amount claimed is over $500. In express terms a written contract is made a prerequisite to the privilege."

It will not do for the undertaker, claiming a privilege under an unwritten and unregistered contract, to say that he did not know that it called for work or material, or both, to an amount exceeding $500, and hence did not reduce it to writing and have it registered, if in point of fact it does, on its face or in its execution, call for an amount exceeding $500, for such a contract, unwritten and unregistered, enjoys no privilege. In case of doubt as to the amount that may be involved, the wiser course for the contractor to pursue is to reduce his contract to writing and register it at the place and within the time that the law prescribes.

Our conclusion is that the judge a quo ruled correctly in rejecting the demand of the intervener for recognition of an undertaker's privilege.

[3] The bagasse and syrup conveyer and the 15-foot piece or section of smokestack are shown to have been added to and merged in the sugar house and thereby to have become parts of an immovable to which the lien for their price does not extend. Swoop v. Martin, 110 La. 237, 34 South. 426.

It is therefore adjudged and decreed that the judgment appealed from be reversed and set aside in so far as it recognizes the vendor's lien claimed by intervener, and otherwise affirmed; intervener to pay the cost of the appeal.

PROVOSTY, J., concurs in the decree.